**FEDERAL INSURANCE COMPANY I.C. and Aetna Insurance Company, Plaintiffs, Appellants,**

v.

**BANCO DE PONCE, Defendant, Appellee.**

No. 84–1331.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1984.

Decided Dec. 20, 1984.

---

Michael Maillet, New York City, with whom Jerome Murray, Hendler & Murray, New York City, Nelson Biaggi and Ramirez, Segal & Latimer, San Juan, P.R., were on brief, for plaintiffs, appellants.

Francisco Fernandez Carbia, Hato Rey, P.R., with whom Dubon, Dubon & Vazquez, Hato Rey, P.R., was on brief, for defendant, appellee.

*Of the Federal Circuit, sitting by designation.

Before COFFIN, Circuit Judge, SKELTON,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

This diversity case from Puerto Rico arises out of losses caused when a corporation's employee embezzled money by writing unauthorized corporate checks payable to various banks and then sending those checks to the banks to pay the employee's personal credit card bills. Eventually, the employee was found out. This case is one of several in which the corporation's insurers (as its assignees) seek to recover money from a bank to which the employee sent some of the checks. The insurers here argue theories of "conversion" and "unjust enrichment." We agree with the district court that, on the facts presented here, the insurers cannot recover under these legal theories.

I

The parties submitted this case to the district court on the basis of stipulated facts. Essentially, those facts show that Jorge Pagan Lizardi, an executive of International Charter Mortgage Company ("ICMC"), embezzled money from ICMC between 1969 and 1979. Pagan had authority to write corporate checks, when countersigned by another ICMC employee. Pagan wrote valid (but unauthorized) checks payable to banks where Pagan had personal credit card accounts. He obtained the requisite countersignature by falsely telling the other employee that the checks were for ICMC's debts. He then wrote his own Visa or Mastercharge account number on the back of each check and mailed it to the bank, along with the return portion of his Visa or Mastercharge statement. The bank applied the proceeds of each check to Pagan's personal credit card balance, which often was quite high, for Pagan was evidently running up gambling debts at local casinos and using his credit card to pay those debts. ICMC discovered the embezzlement in August 1979; it uncovered the

details of the loss—which amounted to several hundred thousand dollars—during an investigation that concluded in February 1980.

This case concerns sixteen checks that Pagan sent to the defendant Banco de Ponce between October 1977 and April 1979. They total roughly $46,000. ICMC's insurers sued Banco de Ponce, alleging that the bank owed ICMC (and hence its insurers) this money, because the bank was negligent, because the bank "converted" the money, and because allowing the bank to keep the money would unjustly enrich the bank.

Banco de Ponce filed a counterclaim alleging that, since one of the plaintiffs had *also* insured Banco de Ponce against liability for negligence, the bank was entitled to reimbursement from that plaintiff for any judgment against the bank based on a negligence theory. The plaintiffs then withdrew their negligence count and stipulated before trial that "the issue of defendant's possible negligence is immaterial and irrelevant." The district court considered the remaining issues—"conversion" and "unjust enrichment"—and held that the stipulated facts did not warrant recovery on those theories. The insurers now appeal.

II

The key to understanding this case lies in recognizing the factual importance of appellants' decision not to pursue their negligence claim. The facts are such that the appellants might have obtained some recovery on that theory. (Admittedly, such a recovery would have availed them little because, as we noted above, they also insure the defendant.) We recently considered a related "Pagan check" case, in which these same insurers sued a different bank under Article 1802 of Puerto Rico's Civil Code. Article 1802 provides that any

> person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not

exempt from liability, but entails a reduction of the indemnity.

P.R. Laws Ann. tit. 31, § 5141. The district court had found the bank in that case negligent, but reduced damages by 75 percent because of ICMC's gross negligence. We affirmed the district court's decision, holding that the facts there, similar to those stipulated here, warranted those findings. *Federal Insurance Company v. Banco Popular de Puerto Rico,* 750 F.2d 1095 (1st Cir.1983). We mention that case to emphasize that, despite the factual similarity, the legal issue before us now is a very different one. It is not whether the facts show negligence, but whether they make out a different kind of liability based upon theories of "conversion" or "unjust enrichment." We consider each of these claims separately.

■ a. Appellants argue conversion by pointing to the fact that the bank "intentionally" treated ICMC's money as belonging to the bank and by pointing to common law cases that, they say, predicate liability for conversion upon this type of "intentional" use of another's property. *Borrello v. Perera Co.,* 381 F.Supp. 1226 (S.D.N.Y. 1974), *aff'd,* 512 F.2d 1380 (2d Cir.1975); *Pacific Finance Corp. v. Bank of Yolo,* 215 Cal. 357, 10 P.2d 68 (Cal.1932); *Sims v. United States Trust Co.,* 103 N.Y. 472, 9 N.E. 605 (1886). We think it unlikely that these common law cases govern this action, however, for "in Puerto Rico, the law in the field of damages is governed—both in form and in content—by the civil law system." *Valle v. American International Insurance Co.,* 108 D.P.R. 692 (Puerto Rico Supreme Court Official Translations, vol. 8, at 736) (1979). *But cf. Ayala v. San Juan Racing Corp.,* 112 D.P.R. 804, 811–16 (1982). Although Puerto Rico's cases mention common law authority, *see, e.g., Hull-Dobbs v. Superior Court,* 81 P.R.R. 214, 221–22 (1959); *Heirs of Sorba v. Vinas,* 49 P.R.R. 31 (1935), it is difficult to believe they survive *Valle,* because the history of conversion reveals that it is a quintessential common law claim.

In fact, the history of conversion as a cause of action exemplifies Maine's observation that the substance of the common law was "secreted in the interstices of procedure." H. Maine, *Early Law and Custom* 389 (1890 ed.). Prosser and Keeton point out that, originally, plaintiffs, objecting to certain procedural disadvantages of the medieval writ of "detinue," began to use the action of "trover" to recover their chattels in the possession of others. *See* W. Prosser & W.P. Keeton, *The Law of Torts* 89–90 (5th ed. 1984); S.F.C. Milsom, *Historical Foundations of the Common Law* 321–32 (1969). Trover's procedural prerequisite—an allegation that P had lost the chattel and D had found it—became a legal fiction. By the end of the nineteenth century trover, in effect, had split into separate actions: trespass (interfering with the chattels of another) and conversion (exercising "dominion" over the chattels of another or more seriously interfering with another's ownership rights). *See* W. Prosser & W.P. Keeton, *supra* at 90, citing *Fouldes v. Willoughby,* 8 M. & W. 540, 151 Eng.Rep. 1153 (1841), and *Johnson v. Weedman,* 5 Ill. 495 (1843).

History not only suggests why conversion is unlikely to constitute part of Puerto Rico's civil law, but it also shows why appellants cannot prevail, even under common law precedent. Conversion emerged from its complex procedural background as a tort, the essential element of which was D's (intentional) possession of goods that belonged to P. Whether D came into (or retained) possession of those goods wrongfully, or innocently, was a secondary consideration. The consequent possibility that D, though only an *innocent* converter, could become liable to pay P the full value of the chattels, led to the creation of exceptions and qualifications. W. Prosser & W.P. Keeton, *supra,* at 90. And, the extension of classical "conversion" to cover negotiable instruments, debts, and other nontangible items of value, *see id.* at 91–92, made these exceptions still more important, lest the law of conversion undermine that of, say, negotiable instruments. The upshot was a tort that the *Restatement of Torts* now defines as

an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may *justly* be required to pay the other the full value of the chattel.

*Restatement (Second) of Torts,* § 222A (1965) (emphasis added). *See also id.* (listing defendant's "good faith" as a factor to consider in determining "the justice of requiring the [defendant] to pay the full value of the chattel" that was allegedly converted). Prosser and Keeton explicitly note that conversion "has been confined to those major interferences with the chattel ... [that would] *justify* the forced judicial sale to the defendant which is the distinguishing feature of the action." W. Prosser & W.P. Keeton, *supra,* at 90 (emphasis added).

If we accept, for the sake of argument, appellants' claim that the common law tort is at issue here, plaintiffs cannot recover, for they fail to satisfy this definition. The bank arguably intended to exercise "dominion or control" over ICMC's money. But, even assuming, also for the sake of argument, that money is a "chattel," the appellants have not shown that the bank can *"justly* be required to pay [ICMC] the full value of the chattel." The stipulated facts do not show that the bank took the money with knowledge that it lacked the right to do so. At worst they show a degree of bank negligence, while also demonstrating ICMC fault at least as great as that of the bank, if not greater. Indeed the district court in *Federal Insurance Company v. Banco Popular de Puerto Rico,* No. 80–2562 (D.P.R. June 4, 1982), *aff'd,* 750 F.2d 1095 (1st Cir.1983), found ICMC 75 percent at fault. Given these findings and the fact that a successful action for 'conversion' would shift the entire loss from the plaintiffs to the defendant, how could it be 'just' to find a conversion on the facts presented here?

The cases to which appellant points involve different circumstances which suggest a significantly different balance of fault. Thus, in *Borello v. Perera Co., su-*

*pra,* for example, the court relied on New York law, which required one named as payee of a check to inquire of the check's maker as to the purpose for which the check was issued, before crediting the check's proceeds to the account of a third party. We are not aware of any such provision in Puerto Rico's law. To the contrary, Puerto Rico's Civil Code underscores the reasonableness (in ordinary circumstances) of accepting such a check, for it says that "any person ... can make the payment" of a debt "whether he has an interest or not in the fulfillment of the obligation." Civil Code of Puerto Rico, Article 1112, P.R. Laws Ann. tit. 31, § 3162. And, the creditor may be obliged to accept such a third party payment. 1–2 J. Puig Brutau, *Fundamentos de Derecho Civil* 274 (2d ed. 1976); 8–1 J.M. Manresa, *Comentarios al Codigo Civil Espanol* 601–02 (6th ed. 1967). Similarly, in *Pacific Finance Corp. v. Bank of Yolo, supra,* words written on the face of the check made it unreasonable for the bank to apply the check to the personal account of the third party who deposited the check. *Sims v. United States Trust Co., supra,* and the other cases appellants cite all involve facts revealing comparatively more defendant "fault" than was shown here.

Our discussion of common law conversion demonstrates that appellants could not succeed were Puerto Rico to follow the common law, and that they cannot succeed under civil law. The civil law simply contains no relevant concept comparable to that of conversion. The essential element of Article 1802 (p. 40, *supra*)—the civil law provision under which appellants brought their suit—is not possession of the property of another; rather, it is injury through "fault." *See* 12 J.M. Manresa, *Comentarios al Codigo Civil Espanol* 841–44 (6th ed. 1973); J. Santos Briz., *La Responsabilidad Civil* 41 (3rd ed. 1981). The fault can consist of either an intentional or a negligent act; the code provision does not distinguish clearly between them. C. Rogel Vide, *La Responsabilidad Civil Extracontractual* 90 (1977); J. Santos Briz, *supra,* at 37–38. But, the facts before us here show that whatever fault existed consisted only of negligence. Though many of the bank's acts were intentional (e.g., the bank "intentionally" credited Mr. Pagan's account), the bank's actions were faulty only in the sense that they were negligent—that is, it was not the bank's "intention" to take money to which it was not entitled. Under these circumstances, once the parties have stipulated negligence out of the case, there can be no recovery under Article 1802.

We have discussed both common law and civil law liability here because we recognize that Puerto Rico's "conversion" precedents are somewhat ambiguous. *Hull-Dobbs, supra,* states that Puerto Rico allows recovery for conversion upon a showing of "malicious and wrongful" privation of ownership rights. 81 P.R.R. at 222. And, it refers to common law cases. *Hull-Dobbs* and *Heirs of Sorba, supra,* were decided before *Valle, supra.* We believe that after *Valle,* these earlier cases should be taken to refer to civil law concepts of fault. Even if they do not, however, for the reasons stated, appellants have not here shown conversion.

■ b. Appellants also claim a right to the $46,000 under Articles 1795 and 1797 of Puerto Rico's Civil Code. The first of these provisions states,

> If a thing is received when there was no right to claim it and which, through an error, has been unduly delivered, there arises an obligation to restore the same.

P.R. Laws Ann. tit. 31, § 5121. The second says that a

> person, who in good faith should have accepted a payment of a certain and specified thing not due, shall only be liable for the impairment or loss of the latter and its accessories, insofar as he may have enriched himself by it.

P.R. Laws Ann. tit. 31, § 5123.

As the cases and commentators make clear, these provisions allow recovery only to the extent that a defendant has unjustifiably enriched himself by receiving the object or payment in question. *Silva v. Industrial Commission,* 91 P.R.R. 865, 876

(1965); 4–2 F. Puig Pena, *Tratado de Derecho Civil Espanol* 663–64 (2d ed. 1973); 1–2 J. Castan Tobenas, *Derecho Civil Espanol: Comun y Foral* 808–10 (14th ed. 1984).

The parties dispute whether there is a sufficient "error" or "mistake of fact" to bring these sections into play. We need not investigate these questions further, however, for, even if Articles 1795 and 1797 apply to a case like this one, the facts show no unjustifiable enrichment.

The bank did not keep the $46,000 in question. Rather, the bank paid it (or comparable funds) month by month to the hotels and merchants where Pagan had run up bills. Moreover, the bank did not receive the checks as a payment for $46,000 advanced to Pagan (or his creditors) in a lump sum. There was no such "lump sum" advance. Pagan's credit card limit was apparently $1,600. Pagan charged various amounts to his account over a period of many months. Pagan often exceeded his credit limit of $1,600, but the bank continued to extend credit to Pagan because he continued to send the bank ICMC's checks.

Under these circumstances one cannot say that the bank enriched itself by $46,000 through the receipt of the checks, for in the absence of the checks Pagan would not have come to owe the bank $46,000. One might argue that, without the checks, Pagan could still have run up some initial debt; and, in paying *that* debt the checks "enriched" the bank. But, the stipulated facts do not show that the checks benefitted the bank even in the amounts of such an initial balance"; receipt of the checks might well have led the bank not to try to collect the initial debt until it was too late. We fail to see here the "enrichment" that is the precondition for application of Article 1797.

Our reasoning draws support from Article 1799 of the Civil Code, P.R. Laws Ann. tit. 31, § 5125, which states that one who pays money by mistake to another person cannot obtain that money back in restitution, if the person receiving it,

> believing in good faith that the payment was made on the account of a legitimate and existing credit, should destroy the title or should allow the action to prescribe, or should abandon the pledges or cancel the guaranties of his right.

This provision is designed to protect the creditor whom the mistaken payment has prejudiced by making recovery of the debt, from the true debtor, more difficult. *See* 2–1 M. Planiol & G. Ripert, *Treatise on the Civil Law* 458 (Louisiana State Law Institute trans. 11th ed. 1939); 3 A. Colin & H. Capitant, *Curso Elemental de Derecho Civil* 946–47 (Revista General de Legislacion y Jurisprudencia trans. 1951); 10 H. Mazeaud & J. Mazeaud, *Lecons de Droit Civil* 632–33 (3d ed. 1966). If there is no unjust enrichment in the circumstances that the article describes, there can be none in this case when the facts suggest that the bank would not even have created the debt (would not even have loaned the money) had the "mistaken" checks not arrived. In sum, under these circumstances, appellant's proper recourse is an action under Article 1802 based upon negligence, not an action for "conversion" or "unjust enrichment."

The judgment of the district court is *Affirmed.*