HINKLE, D.B.A AKRON NOVELTY
COMPANY, ET AL., APPELLANTS, *v.*
CORNWELL QUALITY TOOL COMPANY,
APPELLEE AND CROSS-APPELLANT;
ROYAL INSURANCE COMPANY,
INTERVENOR AND CROSS-APPELLANT;
CENTRAN BANK, CROSS-APPELLEE;
COUNTY OF SUMMIT, CROSS-
APPELLEE.

(Nos. 12808, 12809, 12810 and 12825—
Decided May 6, 1987.)

*Samuel J. Georges,* for appellant
G.F. Hinkle.

*James M. Peters,* for cross-appellant Royal Insurance Co.

*Robert M. Gippin,* for appellee and cross-appellant Cornwell Quality Tool Co.

*Richard R. Strong,* for cross-appellee Centran Bank.

*Lynn Slaby,* prosecuting attorney, for cross-appellee Summit County.

CACIOPPO, J. This case involves the appeal and cross-appeal of G.F. Hinkle, d.b.a. Akron Novelty Co. ("Akron Novelty"), and Cornwell Quality Tool Co. ("Cornwell"), respectively. Cornwell's subrogee, Royal Insurance Company, intervened in the trial action and joins Cornwell in its appeal. Defendants-cross-appellees, Centran Bank ("Centran") and County of Summit ("Summit") have filed cross-appellee briefs.

I. Akron Novelty's Appeal

The essential facts of this appeal are as follows:

Linda Zelnar embezzled $57,000 from Akron Novelty while she was employed there as a bookkeeper. She was discovered and discharged.

Rather than prosecuting her for the crime of embezzlement, the Summit County Prosecutor's office referred Zelnar to its pretrial diversion program pursuant to R.C. 2935.36. After giving Zelnar a psychological examination, the director of the program, Mark Tully, enrolled her in the diversion program. One of the requirements of her participation in the program was her restitution of the stolen funds.

Zelnar told Tully she would be able to return Akron Novelty's funds by refinancing her home and borrowing from her parents. Zelnar presented Tully with two checks on two different

occasions — one for $20,000 and a second for $37,000. The testimony contained in the trial transcript and depositions indicates that Hinkle had some concerns as to whether the first check was good. He had Tully and Zelnar get Centran to assure that there were sufficient funds in her account to cover the check. This Centran did. Zelnar got the second check for $37,000 certified. Hinkle deposited both checks in the accounts from which the funds had originally been taken.

Some seven months later, Cornwell named Akron Novelty a defendant in an amended complaint. Also named were Linda and Ronald Zelnar, Kelly Services, Inc., First National and Centran Banks, and Summit County. Cornwell alleged that the funds given to Hinkle were embezzled by Zelnar while she was in its (Cornwell's) employ. Cornwell proceeded against Akron Novelty and the Zelnars on the alternative theories of conversion and unjust enrichment. It sought recovery against Kelly Services, Centran, and Summit County on negligence theories. First National was voluntarily dismissed from the case.

Akron Novelty, Centran, and Summit County filed motions for summary judgment. The court granted Summit's and Centran's motions on the basis of prosecutorial immunity and the UCC's "imposter rule," respectively. Akron Novelty's motion was denied. Cornwell filed a motion for summary judgment against Linda Zelnar, which was granted.

The case went to trial against defendants Ronald Zelnar, Kelly Services and Akron Novelty. At the close of plaintiff's case in chief, Akron Novelty moved for a directed verdict. Its counsel asserted four bases for the motion: (1) the distinction between goods versus money and negotiable instruments under the law of conversion; (2) the fact that Hinkle lacked any notice that the funds received were embezzled or tainted; (3) the fact that he received them in good faith as payment for an antecedent debt; and (4) that the evidence thus far presented did not show otherwise. The trial court made a tentative ruling on the motion which was never placed on the record. However, the motion of defendant Ronald Zelnar was granted.

The case against Kelly Services and Akron Novelty went to the jury. The jury was instructed on the law of conversion and negligence. Although both sides submitted a proposed instruction on conversion, the trial court gave one more nearly resembling plaintiff's — omitting any language concerning any distinction between money and goods or the question of a bona fide status. The jury returned a verdict against Akron Novelty. We reverse this judgment and enter judgment in favor of Akron Novelty. App. R. 12(B).

Akron Novelty's Assignments of Error

"1. The court erred in overruling G.F. Hinkle's motion for summary judgment.

"2. The court erred in overruling G.F. Hinkle's motion for directed verdict and allowing the case to go to the jury.

"3. The court erred in overruling G.F. Hinkle's motion for judgment notwithstanding the verdict."

Cornwell argues that Akron Novelty waived appellate review of the trial court's rulings by not lodging a specific objection to the trial court's jury instruction on conversion. Hence, Cornwell's contentions regarding waiver will be addressed first.

A. Akron Novelty's Motion for Summary Judgment

The denial of a motion for summary judgment is not a final appealable order pursuant to R.C. 2505.02. *State, ex rel. Overmeyer,* v. *Walinski*

(1966), 8 Ohio St. 2d 23, 37 O.O. 2d 358, 222 N.E. 2d 312. Therefore, an appellant is precluded from seeking appellate review of such a denial until the opposing party is granted summary judgment disposing of all the parties and claims in the case (absent Civ. R. 54[B] language), or the case is tried, and a final resolution made. Cornwell cites no Ohio cases supporting its proposition that appeal of a denial of a summary judgment motion is waived where the party fails to object to the instruction given the jury.

The Ohio Supreme Court has held that a denial of a motion for summary judgment is reviewable on appeal from a' subsequent adverse final judgment. *Balson* v. *Dodds* (1980), 62 Ohio St. 2d 287, 16 O.O. 3d 329, 405 N.E. 2d 293, paragraph one of the syllabus. We conclude that Akron Novelty did not waive review of the denial of its summary judgment motion.

B. Akron Novelty's Motion for a Directed Verdict

The trial court addressed Cornwell's and Akron Novelty's opposing motions for directed verdict as follows:

"BY THE COURT: All right. Gentlemen, let the record show the jury has not yet been called in. I have discussed in chambers with Counsel my tentative rulings on motions, and I want this opportunity for anyone to phrase any objections or any other comments they think appropriate.
"* * *

"BY THE COURT: Okay. Now, gentlemen, I'm further reserving all motions until I hear all the evidence from any source on the other claims. I appreciate this is such an unusual case that I don't know if I can get a handle on it, but I appreciate all the work you've done last night and for the last couple months. Are we ready for the jury? * * *"

Akron Novelty did not renew its motion for a directed verdict at the close of all the evidence. Neither did the trial court enter a ruling on the record before entering a final judgment on the verdict. Normally, when a defendant moves for a directed verdict at the close of the plaintiff's evidence, he must renew the motion at the conclusion of all the evidence or suffer a waiver of the ruling on appeal. *Neiswender* v. *Edinger* (1978), 59 Ohio App. 2d 25, 13 O.O. 3d 96, 392 N.E. 2d 580, paragraph one of the syllabus. However, this procedural rule assumes that the trial court denied the initial motion. Thus, the instant facts do not support Cornwell's waiver theory.

Akron Novelty had no reason to "renew" its motion when there had been no formal ruling. There being no need to reactivate the motion, Akron Novelty will not be charged with a waiver of any error in the trial court's not granting the motion.

C. Akron Novelty's Motion for Judgment N.O.V.

Cornwell maintains that any error concerning both this motion and Akron Novelty's motion for a directed verdict were not preserved because Akron Novelty failed to file a specific objection to the trial court's jury instruction on conversion. Cornwell cites federal cases where the denials of motions for judgment n.o.v. were upheld because the motions attacked the validity of the jury instructions, and no specific objections were lodged. Cornwell's cited cases are inapposite for several reasons.

Akron Novelty did not attack the trial court's instructions in its directed verdict motion, or its motion for judgment n.o.v. The motions were based on the "exception" of money and negotiable instruments under the law of conversion and on Hinkle's bona fide status. The argument made on the motion for the directed verdict was the inapplicability of the law of conversion to the facts of the case. The judgment

n.o.v. motion asserted that the verdict was *contrary to law*. Additionally, Akron Novelty did not waive review of the omission in the instructions. It submitted its own instruction on conversion which dealt with the money exception, Hinkle's lack of notice, and his good faith in accepting the check. Under the holding of *Presley* v. *Norwood* (1973), 36 Ohio St. 2d 29, 65 O.O. 2d 129, 303 N.E. 2d 81, Akron Novelty preserved the error in the trial court's charging of the jury.

The *Presley* court held that a party who fails to formally object to a jury instruction does not waive an error in the instruction for purposes of appellate review where that party submits a proposed instruction which apprises the trial court of the *correct* law governing an issue. As will be discussed *infra,* Akron Novelty's instruction was a correct statement of the law. That given by the trial court was not. Thus, the failure to lodge specific objection to the instructions cannot constitute a waiver of the alleged error in denying the motions.

Having determined that Akron Novelty has preserved appellate review of the trial court's rulings on its three motions, we will now address those rulings.

Civ. R. 56(C) recites in pertinent part that:

"* * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"

This court recently found in *Brown Communications Co.* v. *Highley* (Feb. 25, 1987), Summit App. No. 12720, unreported, that "[t]his test is identical to that which must be applied by the trial court before rendering a decision on a motion for a directed verdict. Civ. R. 50(A)(4). Although the above test is not recited in Fed. R. Civ. P. 56, the United States Supreme Court has held that the inquiry to be made by the trial court in ruling on a motion for a directed verdict and on a motion for summary judgment are the same." *Id.* at 3, citing *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. 242, 251-252.

The standard of review for a ruling on a motion for judgment n.o.v. is the same one applicable to a motion for a directed verdict. *Posin* v. *A.B.C. Motor Court Hotel* (1976), 45 Ohio St. 2d 271, 74 O.O. 2d 427, 344 N.E. 2d 334. Thus, it can safely be said that all three orders now under examination are subject to the same standard of review. The denial of all three can, therefore, be addressed simultaneously.

The Restatement of the Law 2d, Torts (1965) 431, Section 222A, defines the tort of "conversion" and sets out the circumstances under which a defendant will be held liable:

"(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

"(2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

"(a) the extent and duration of the actor's exercise of dominion or control;

"(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

"(c) the actor's good faith;

"(d) the extent and duration of the resulting interference with the other's right of control;

"(e) the harm done to the chattel;

"(f) the inconvenience and expense caused to the other."

Is money recoverable under a conversion theory? It is stated in 18 Ohio Jurisprudence 3d (1980) 484, Conversion and Replevin, Section 5, that:

"Although money is property which is often difficult to identify, it is well settled that an action will lie for its conversion when identification is possible and there is an obligation to deliver the specific money in question."

However, the conclusiveness of the above statement is seriously undermined by *Schutt* v. *Bates* (1929), 33 Ohio App. 303, 169 N.E. 314, which recites, in paragraph two of the syllabus, that:

"Where common pleas court found that defendant in error *had no knowledge of source of money wrongfully mingled* with her money by her husband to purchase second mortgage, Court of Appeals *cannot make finding of law enabling plaintiff in error, who furnished such money, to sue wife therefor, in absence of any other facts before court.*" (Emphasis added.)

This holding substantially modifies the encyclopedia quotation set out above by adding a lack of knowledge proviso. It would also explain the confusion exhibited by the courts in determining when the good faith of a party acquiring stolen "property" is significant. For example, it is said that a purchaser of stolen *chattels* is liable for conversion despite his good faith and the fact that there was adequate consideration given. 18 Ohio Jurisprudence 3d, *supra*, at 505-506, Section 34; Prosser & Keeton, Law of Torts (5 Ed. 1984) 93, Section 15. However, where money and negotiable instruments are involved, the bona fide nature of the transaction becomes pivotal. Thus, in *Rankin* v. *Chase Natl. Bank* (1903), 188 U.S. 557, the United States Supreme Court held that one

who has in good faith received currency in payment of an existing debt cannot be compelled to make repayment even when it subsequently appears that such currency had been embezzled by the one who made the payment.

In *Rankin,* Chase Bank had accepted $15,000 from the maker in repayment of the note — $8,000 in cash and $7,000 in the form of a cashier's draft drawn on his employer's account. The maker had embezzled these funds from his employer, a bank. In finding that the $7,000 draft was recoverable in a conversion action, the court stated:

"* * * The draft for $7,000, which was collected by Chase bank, *was not drawn by the cashier to his individual order, but was drawn by him as cashier to his order as cashier,* and was indorsed for deposit to his credit as cashier. It was therefore but an order transferring the funds of the Elmira bank, which were on deposit in the Philadelphia bank, to the deposit account of the Elmira bank with the Chase bank. True it is that Bush, from one view of the testimony, first tendered a draft signed by himself as cashier to his individual order; *but such draft was not taken by the Chase bank. It may be, if the principles of authority implied from a course of business as announced by the lower court, be sound, and if the facts brought this case within such a rule, if the Chase bank had taken the cashier's draft to his individual order, it could have retained the money.* * * *"* (Emphasis added.) *Id.* at 565-566.

The general rule, as evidenced by the great weight of authority, is that only bad faith on the part of a third person receiving stolen money, or his failure to pay valuable consideration therefor, will defeat his title thereto as against the true owner. Annotation (1958), 62 A.L.R. 2d 537. Money and bank notes are the exception to the

general rule that no one can obtain title to stolen property. 54 American Jurisprudence 2d (1971) 555, Money, Section 7. A holder in due course of a stolen negotiable instrument can receive good title thereto and is subject only to the defense that he was a party to the theft. *Id.* at 557, Section 8. In sum, a bona fide purchaser of a bank note, or a holder in due course, cannot be held liable for conversion.

In *Federal Ins. Co.* v. *Banco De Ponce* (C.A. 1, 1984), 751 F. 2d 38, an employee used unauthorized company checks to pay his credit card bills. The bank that issued the credit cards was the named payee on the checks. The bank cashed the checks and used the proceeds to pay various merchants with whom the employee had done business. When the defalcations were discovered, the employer's subrogee sued the bank under unjust enrichment and conversion theories.

The federal district court entered judgment in favor of the bank. The United States Court of Appeals for the First Circuit affirmed. Applying the Restatement (Second) definition of "conversion," the appellate court found that the employer could not recover under a common-law theory. The court stated:

"* * * Prosser and Keeton explicitly note that conversion 'has been confined to those major interferences with the chattel * * * [that would] *justify* the forced judicial sale to the defendant which is the distinguishing feature of the action.' W. Prosser & W. P. Keeton, *supra,* at 90. [Emphasis added.]

"If we accept, for the sake of argument, appellants' claim that the common law tort is at issue here, plaintiffs cannot recover, for they fail to satisfy this definition. The bank arguably intended to exercise 'dominion or control' over ICMC's [the employer's] money. But, *even assuming, also for the sake of argument, that money is a 'chattel,' the appellants have not shown that the bank can 'justly be required to pay [ICMC] the full value of the chattel.' The stipulated facts do not show that the bank took the money with knowledge that it lacked the right to do so. At worst they show a degree of bank negligence,* while also demonstrating ICMC fault at least as great as that of the bank, if not greater. Indeed the district court in *Federal Insurance Company* v. *Banco Popular de Puerto Rico,* No. 80-2562 (D.P.R. June 4, 1982), *aff'd,* 750 F. 2d 1095 (1st Cir. 1983), found ICMC 75 percent at fault. *Given these findings and the fact that a successful action for 'conversion' would shift the entire loss from the plaintiffs to the defendant, how could it be 'just' to find a conversion on the facts presented here? * * *"* (Emphasis added.) *Id.* at 41.

The federal appellate court emphasized the Restatement's inclusion of the defendant's "good faith" as a factor to be determined in deciding whether he should be held liable in conversion. *Id.* Finding no evidence of bad faith on the part of the bank in accepting the checks, the court affirmed the judgment.

Reasonable minds could not differ as to the bona fide nature of Akron Novelty's conduct in accepting the checks. Hinkle received the two instruments without any notice that the funds were embezzled. The funds were received as payment for an antecedent debt. There is absolutely no evidence in the record either before, during, or after the trial which would negate Akron Novelty's bona fide status. Accordingly, assignments of error one, two, and three are sustained. The judgment of the trial court on the jury's verdict is reversed and judgment is rendered in favor of Akron Novelty Company. App. R. 12(B).

## II. Cornwell's Cross-Appeal

The facts relevant to the cross-appeal of Cornwell are as follows:

Linda Zelnar was discharged from Akron Novelty on April 6, 1984. On April 30, 1984, she was employed, through Kelly Services, as an accounts payable clerk for Cornwell Quality Tools. She was eventually hired directly by Cornwell, and filled out an application listing previous employment, including Akron Novelty. However, Cornwell never made its own inquiries into her previous employment, relying on the assumption that Kelly Services had already done so.

Zelnar's duties included the personal preparation of checks to Cornwell's creditors. While employed at Cornwell, Zelnar conceived a plan to embezzle money to pay back Hinkle, as well as for her own use. She established an account at Centran Bank in the name of "Linda R. Zelnar d.b.a. 'Model'." She also purchased a kit and made a rubber stamp that read "For Deposit Only, Model."

Cornwell had regularly done business with Model Industries, Inc. of Chicago. When mailing more than one check, it was Cornwell's policy to make the first check in a group payable with the full name and address of the payee. The remaining checks were made payable only to "Model." Over a three-month period, Zelnar prepared six checks payable to "Model," which were drawn on Cornwell's account at First National Bank. She presented the checks for the proper drawers' signatures and then took the checks, endorsed them with the stamp, and deposited them in the account at Centran. All six of the checks were accepted for payment by First National which charged them to Cornwell's account.

Zelnar drew two checks on the Centran account that were payable to Hinkle. When Centran notified Zelnar that one of the checks was going to be returned for uncollected funds, Zelnar obtained a letter from Centran explaining the delay, and gave the letter to Mr. Tully of the diversion program. Zelnar was concerned because a check returned for insufficient funds would result in her ouster from the program. When the embezzlement scheme was discovered, the funds remaining in the Centran account were frozen and then returned to Cornwell.

Cornwell filed a complaint, seeking to enjoin the funds in the Centran account, and an amended complaint, alleging that Centran failed to exercise ordinary care in the establishment of the account and collection of the checks. Royal Insurance Company, which paid Cornwell $50,000, intervened in the suit as subrogee. Royal charged Centran and First National with conversion, pursuant to R.C. 1303.55 (UCC 3-419), and alleged that Centran failed to exercise ordinary care in the establishment of the account and collection of the checks. Centran filed motions for summary judgment against both plaintiffs. First National was voluntarily dismissed from the suit. The trial court granted summary judgment to Centran. We affirm.

Cornwell's Assignment of Error I

"The trial court erred in granting summary judgment for Centran Bank."

Cornwell has assigned only one error on its cross-appeal against Centran, and raises three issues as to the impropriety of the trial court's action. However, there is a collateral issue, not raised by the parties, that provides an alternative ground of disposition of the case at bar. We note that there is an open question as to whether Ohio allows the drawer of a check a right of recovery against a depositary/collecting bank in addition to, or in the alternative to, recovery against the drawee/payor bank on the deposit con-

tract. See *Lavanier* v. *Cosmopolitan Bank & Trust Co.* (1929), 36 Ohio App. 285, 173 N.E. 216 (pre-UCC case precluding suit against depositary bank). The courts of other states are divided on this issue, and their decisions vary in result and rationale. See *Underpinning & Foundation Constructors, Inc.* v. *Chase Manhattan Bank, N.A.* (1979), 46 N.Y. 2d 459, 414 N.Y. Supp. 2d 298, 386 N.E. 2d 1319; *Stone & Webster Engineering Corp.* v. *First Natl. Bank & Trust Co.* (1962), 345 Mass. 1, 184 N.E. 2d 358. Cf. *Sun 'n Sand, Inc.* v. *United California Bank* (1978), 21 Cal. 3d 671, 582 P. 2d 920. The UCC establishes a delicate scheme to allocate the risk of loss due to the negotiation of checks with forged indorsements. *Ed Stinn Chevrolet, Inc.* v. *Natl. City Bank* (1986), 28 Ohio St. 3d 221, 226, 28 OBR 305, 309, 503 N.E. 2d 524, 530; accord McDonnell, Bank Liability for Fraudulent Checks: The Clash of the Utilitarian and Paternalist Creeds Under the Uniform Commercial Code (1985), 73 Geo. L. J. 1399, 1404. A direct suit by the drawer against the depositary bank could be viewed as a circumvention of the statutory scheme. Because this issue is not directly before us, we will not base our decision on it, but merely express that we are cognizant of its potential for future debate.

Assuming that Ohio affords the drawer such a cause of action, we believe that the depositary/collecting bank should be permitted to raise the same Code defenses available to a drawee/payor bank, including the imposter rule.

Cornwell poses the following issue for review:

"Do checks drawn to pay bona fide obligations of the employer stand outside the 'Impostor Rule' of R.C. 1303.41 (UCC 3-405), even though the employee presenting them for signa-

ture intends to divert them from the named payee?''

Application of the impostor rule in R.C. 1303.41 (UCC 3-405) deems a forgery effective to pass good title to a negotiable instrument. The rule is an exception to the strict liability imposed on a bank that pays on a forged indorsement. The loss is shifted to the drawer because the responsibility for the payment can be attributed more to the drawer's actions than to the bank's failure to obtain a proper indorsement. In the instant case, it is R.C. 1303.41(A)(3) (UCC 3-405[I][C]) that applies:

"(A) An indorsement by any person in the name of a named payee is effective if:

"* * *

"(3) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.''

The policy behind this rule is explained in Official Comment 4 of the section:

"* * * The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.''

To receive the protection of this rule, Centran has to meet both prongs of the statute, *i.e.:*

1. That Linda Zelnar supplied the name of the payee, "Model," to her employer, Cornwell; and

2. That Linda Zelnar intended

the payee, "Model," to have no interest in the checks.

In its attempt to meet the first prong, Centran uses a strained and contorted line of reasoning. Centran claims that the entity "Model" was fictitious because Cornwell did not do business with any entity designated as such. For the purposes of the rule, a forger using the name of a fictitious payee obviously shows the name was "supplied" to the employer.

Cornwell did, however, do business with "Model Industries, Inc." of Chicago. The record shows that "Model" cannot be considered a fictitious entity, and even if it were, it would have been "created" by Cornwell itself. Zelnar stated in her deposition that it was company policy to abbreviate the names of payees such as Model Industries, Inc.

"* * * It was Cornwell's practice in a situation where several invoices were to be paid to one supplier on a single day — as was the case with Model Industries which was a constant supplier to Cornwell — that only the first check in the group would bear the full name and address of the payee. This check would be inserted in the window of the envelope, while the other checks would bear only the abbreviated name of the payee. There was nothing extraordinary about her use of the word 'Model' on the following checks, particularly since the invoices to which they applied were perfectly genuine. Thus, it is inaccurate to say that 'Cornwell never had done business with the fictitious entity called "Model," ' as stated on page 1 of Centran's [trial] Brief. As used on these checks, "Model" clearly pertained to Model Industries, Inc. of Chicago, from which the invoices attached to them had been received." Transcript of Docket & Jour. Entries, Item 70, Plaintiff's Further Reply to Motion for Summary Judgment.

To fit within the first prong of the rule, Centran bases its entire argument upon the "fictitious entity" premise.

To escape the application of the first prong of the rule, Cornwell uses a more plausible argument as to when an employee can be considered to have "supplied" the name of the payee. Specifically, the issue is whether an employee can "supply" a payee's name when the check is issued to a real person in payment of a genuine obligation of the employer. Several courts have held that where a check is issued to a bona fide creditor who had furnished legitimate invoices, the employee's action amounts to no more than theft of the check. An employee cannot be said to have "supplied" the name of a payee in the course of a normal business transaction that would have occurred in any event. See *Danje Fabrics Div.* v.. *Morgan Guaranty Trust Co.* (1978), 96 Misc. 2d 746, 409 N.Y. Supp. 2d 565; *Snug Harbor Realty Co.* v. *First Natl. Bank of Toms River, N.J.* (1969), 105 N.J. Super. 572, 253 A. 2d 581.

This theory has been criticized and the distinction between bona fide and fraudulent transactions has been considered inappropriate. Note, U.C.C. Section 3-405: Of Impostors, Fictitious Payees, and Padded Payrolls (1979), 47 Fordham L. Rev. 1083, 1104. The author of this article asserts that the policy reasons for the rule apply to business atmospheres in general. An employer who delegates check processing duties must responsibly supervise employees. "The business risk assumed by an employer who allows employees to process supporting documents or prepare checks is just as real whether the invoices presented are forged or authentic * * *." *Id.* at 1105.

There is no Ohio case directly on point. However, an impression of the Ohio view can be gleaned from the combined consideration of two cases.

In the very recent case of *Ed Stinn Chevrolet, Inc., supra,* a bookkeeper's embezzlement scheme partially involved checks with forged payee indorsements.[1] The court readily applied R.C. 1303.41(A)(3).

It is not clear from the facts given in the opinion whether any of the checks were issued on bona fide transactions. However, the court stated that:

"* * * [O]ur conclusion is consonant with this court's pre-UCC position of resting such losses with the employer. The syllabus in *Hillside Dairy Co.* v. *Cleveland Trust Co.* (1944), 142 Ohio St. 507 [27 O.O. 435], so holds as follows:

" '1. Where one of two innocent parties must suffer because of a fraud or forgery, justice requires that the loss be borne by him who is first at fault and put in operation the power which resulted in the fraud or forgery.

" '2. A depositor may not recover from a depositary for loss sustained by reason of the payment of checks, each bearing a forged indorsement, when such loss is due to the negligence of the depositor *through his continued, misplaced confidence in his own faithless employee who committed the forgeries and concealed them from both the depositor and the depositary.' "* (Emphasis added.) *Id.* at 229, 28 OBR at 312, 503 N.E. 2d at 532.

In *Hillside, supra,* the facts show that one hundred and two checks were drawn to forty-eight payees, "to *some* of whom the company was not indebted." (Emphasis added.) *Id.* at 508. From this statement, it follows that there were some named payees to whom the employer *was* indebted. Therefore, if Ohio's present policy

under R.C. 1303.41 (UCC 3-405) is consonant with the pre-UCC position, as stated by the Supreme Court, it is irrelevant whether the transactions are bona fide or fraudulent when applying the impostor rule. An employee can be considered to have supplied the name in either situation.

The second prong of the rule requires that, in supplying the name, the employee must intend that the named payee have no interest in the check. Linda Zelnar freely admitted that, at the time she presented the checks to her superiors for their signatures, she never intended the true payee, Model Industries, Inc. of Chicago, to have any interest in the check.

Having met the requirements of R.C. 1303.41(A)(3) (UCC 3-405[1][C]), the forgery must be considered effective to pass good title on the instrument, and Cornwell must bear the loss. Therefore, summary judgment was appropriate in this case.

Cornwell raises a second issue, asserting that the negligence of Centran precludes the benefits of R.C. 1303.41, making summary judgment improper. Cornwell claims that, in spite of Centran's relief from statutory liability by operation of R.C. 1303.41, a triable issue of fact remained as to Centran's actual negligence in failing to exercise ordinary care in the transaction.

There are three Code provisions which allow a bank to escape strict liability for paying on a forged indorsement. R.C. 1303.42 (UCC 3-406) and R.C. 1304.29 (UCC 4-406) both specifically provide that where the drawer asserts and can prove that the bank failed to exercise reasonable commercial standards in handling the

---

[1] We are aware that the *Ed Stinn* case has been set for rehearing, but do not believe the portion relevant to this appeal will be affected. [Reporter's Note: See *Ed Stinn Chevrolet, Inc.* v. *Natl. City Bank* (1987), 31 Ohio St. 3d 150, 31 OBR 316, 509 N.E. 2d 945.]

check, the bank loses its protection. R.C. 1303.41 (UCC 3-405) is silent on the issue of the bank's lack of care. We do not believe this silence to be inadvertent. The policy statements provided in the Official Comment denote an intent to place the loss on the party best able to prevent it. See *Western Cas. & Sur. Co.* v. *Citizens Bank of Las Cruces* (C.A. 10, 1982), 676 F. 2d 1344.

In *Ed Stinn,* the Ohio Supreme Court, cognizant of the volume and pressures involved in modern-day banking business, evinced support of the Code's method of risk allocation. The court accepted the argument in the *amici* briefs as advancing legitimate public policy goals, and reversed the court of appeals' decision "* * * as contrary to the UCC's philosophy of placing the risk of loss due to the acts of a dishonest employee upon the employer. The decision below runs counter to modern demands for fast check processing and vastly expands banks' liability to unprecedented and dangerous extremes with results * * * that were never intended by the UCC's drafters. * * *" *Ed Stinn, supra,* at 229, 28 OBR at 312, 503 N.E. 2d at 532, fn. 6.

Furthermore, the court was persuaded by the Kentucky view that UCC 3-405 is " 'a banker's provision intended to narrow the liability of the banks and broaden the responsibility of their customers.' " *Id.* at 228, 28 OBR at 311, 503 N.E. 2d at 532. It is apparent, therefore, that the negligence of the bank is immaterial where Section 3-405 applies.

Cornwell also maintains that a common-law negligence action is outside the scope of the Code, and therefore is not displaced by UCC 3-405. In rejecting this contention, we adopt the reasoning of the court in *Western Cas., supra.* Like Cornwell, the drawer in that case relied on UCC 1-103 (R.C. 1301.03) which provides

that the Code is supplemented by general "principles of law and equity * * *" unless "displaced by the particular provisions * * *" of the Code. "Section 3-405 does not explicitly displace the bank's obligation to act with reasonable care; it simply does not discuss the bank's standard of care." *Western Cas., supra,* at 1347. When compared with the negligence provisions in UCC 3-406 and 4-406, the absence of such a clause implicitly demonstrates an intent to displace common-law negligence actions. *Id.* at 1347-1348.

The *Western Cas.* court relied on the same reasoning relied on by the Ohio Supreme Court in *Ed Stinn* in interpreting the scope of UCC 3-405:

"The interpretation of Section 3-405 as an *absolute* loss allocation device is also more consistent with the recognition that this section was conceived as 'a banker's provision *intended to narrow the liability of banks* and broaden the responsibility of their customers.' " (Emphasis added.) *Western Cas., supra,* at 1348, citing *General Accident Fire & Life Assurance Corp.* v. *Citizens Fidelity Bank & Trust Co.* (Ky. Ct. App. 1975), 519 S.W. 2d 817, 819.

Such a "banker's provision" was not likely to have been intended to leave the banks open to common-law liability. Therefore, since the Supreme Court has clearly expressed faith in and support of the policies advanced by the drafters, it can safely be said that R.C. 1303.41 (UCC 3-405) displaces any negligence claims against the depositary bank, common-law or otherwise.

Since it was clear that Centran Bank met the requirements of R.C. 1303.41(A)(3), and that R.C. 1303.41 (A)(3) is an absolute defense, regardless of negligence on the part of a bank, the trial court acted properly in granting Centran Bank's motion for

summary judgment. Cornwell's first assignment of error is overruled.

Cornwell's Second Assignment of Error

"The trial court erred in sustaining the motion to dismiss of the County of Summit.

"A. The county enjoyed no sovereign immunity for negligent acts occurring in 1984, which were the subject of the present amended complaint filed on February 28, 1985.

"B. The county does not have the benefit of the official immunity of its prosecuting attorney and is liable for his negligent actions."

In its contentions concerning the trial court's order dismissing the prosecutor's office from this case, Cornwell completely ignores the basis of the trial court's order. The trial court did not grant Summit's motion to dismiss on the basis of sovereign immunity, or on the basis of official immunity. The trial court found the county impervious to lawsuit under the doctrine of quasi-judicial immunity afforded to prosecutors. See *Imbler* v. *Pachtman* (1976), 424 U.S. 409.

The trial court found that the operation of the diversion program was part of the prosecution's initiation and presentation of the state's case and, therefore, within the quasi-judicial function protected from civil liability. This immunity extends to all prosecutors involved in the program, to the program itself, and to the county. Cf. *Jarvis* v. *Slaby* (Nov. 13, 1985), Summit App. No. 12116, unreported. Accordingly, Cornwell's second assignment of error is overruled and the judgment is affirmed.

*Judgment accordingly.*

MAHONEY, J., concurs.

QUILLIN, P.J., concurs in judgment only.