CRESCENT WOMEN'S MEDICAL GROUP, INC.

v.

KEYCORP, d.b.a. KeyBank.

2003-Ohio-7367.]

Court of Common Pleas of Ohio,
Hamilton County.

No. A–01–06592.

Decided April 4, 2003.

The Brown Firm Inc., L.P.A., and Robert S. Brown, for plaintiff.

Green & Green and Erin Moore, for defendant.

---

THOMAS H. CRUSH, Judge.

{¶ 1} This matter is before the court upon motion for summary judgment filed on behalf of defendant.

{¶ 2} In January 1977, Mary Kurtz was hired as executive director of Crescent Women's Medical Group, Inc., with authority to fill out, sign, and issue checks on behalf of Crescent. From August 1999 to March 2001, Kurtz and Mary Suhr, a subordinate employee, used ATM machines to deposit to their own accounts 40 Crescent checks made payable to various corporate Crescent creditors. All of the checks were unendorsed, six of them having the words "for deposit only" written on the back. Apparently, defendant KeyBank did not check the name of the payee on any of these checks.

{¶ 3} Various theories of defense have been asserted by defendant, one of them pertaining to a contractual limitations period.

{¶ 4} The KeyBank "business non-personal signature card", executed September 30, 1997, authorizing KeyBank to accept the signature of Mary Kurtz (and others) on checks, reads:

"KeyBank * * * is authorized to recognize any of the signatures subscribed above for the transaction of any business for the Account in connection with funds belonging to the Entity for whom this Account is titled. * * *

"It is agreed that all transactions on this Account shall be subject to the existing Deposit Agreement and Disclosures. * * * By executing this signa-

ture card each signer shall be bound by the terms and conditions of said Deposit Agreement and Disclosures. * * * "

{¶ 5} The relevant deposit account agreement, effective June 17, 1996, reads, at pages 5 and 6:

"10. Account Statements: Limitation on Time to Report Forgers and Errors. You should review and balance your Account statements promptly after you receive them. * * * You must review your statements to make sure that there are no errors in the Account information.

"On Accounts with check-writing privileges, you must review your statement and any canceled checks we send you and report forgeries, alterations, *missing signatures,* * * * or other information which might lead you to conclude that the check was forged. * * * You should notify us as soon as possible if you think there is a problem. * * * "

"You must notify us as soon as possible if you believe there is an error, forgery or other problem with the information shown on your Account statement. You agree that fourteen (14) days after we mailed a statement * * * is a reasonable amount of time for you to review your Account statement and report any errors, forgeries or other problems. In addition, you agree not to assert a claim against us concerning any error, forgery or other problem relating to a matter shown on an Account statement unless you notified us of the error, forgery or other problem within sixty (60) days after we mailed you the statement. * * * This means, for example, that you cannot bring a lawsuit against us, even if we are at fault, for paying checks bearing a forgery of your signature unless you reported the forgery within sixty (60) days after we mailed you the statement * * * listing the check we paid." (Emphasis added.)

{¶ 6} An agreement reducing the statutory time for bringing an action against a bank can be legally enforceable:

"As noted, although § 404.406(4), Stats., 1991–2, provided that the notice must be made 'within one year from the time the statement and items are made available to the customer,' Firstar Bank contends that this one-year period was lawfully reduced to fourteen days by the clauses quoted above from Borowski's agreements with Firstar Bank. * * * Borowski * * * asserts that the attempted modification was ineffective because § 404.406(4), Stats., 1991–2, prevents any agreement between a bank and it customer from 'disclaiming a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or * * * limiting the measure of damages for such lack or failure.' We disagree—it is not the *agreement* * * * that gives the bank immunity even if it is negligent * * *; all the agreement does is reduce the time within which the customer must notify the bank of an unauthorized signature or alteration from one year to fourteen days. * * * "

"The only reported case that we were able to find that addresses the precise question at issue here, *Parent Teacher Ass'n v. Manufacturers Hanover Trust Co.*, 138 Misc.2d 289, 524 N.Y.S.2d 336, * * * approved a reduction from one year to fourteen days without regard to whether or not the bank was negligent. * * * "

"Conditions precedent and shortened periods of limitation similar to those at issue here have been routinely accepted in the banking relationship. * * * Such provisions are not only compatible with statute and case law; they are in accord with public policy by limiting disputes in a society where millions of bank transactions occur every day." *Borowski v. Firstar Bank Milwaukee* (1998), 217 Wis.2d 565, 574, 578, 579 N.W.2d 247.

{¶ 7} In the instant matter, it is undisputed that no notice was given to KeyBank of the missing endorsements for well over 60 days. KeyBank claims that it is entitled to summary judgment pursuing to the foregoing authority.

{¶ 8} The court finds that the contractual obligation placed upon the check writer to check for "missing signatures" pertains to signatures missing on the face of the check, not to missing endorsements, and further finds that the contractually shortened limitation period does not apply in this case. These findings are based upon several considerations:

{¶ 9} First, R.C. 1304.35 (UCC 4–406) reads:

"(C) If a bank sends * * * a statement of account or items * * * the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. * * * "

{¶ 10} The official comments to the Uniform Commercial Code regarding this section read:

"Section 4–406 imposes no duties on the drawer to look for unauthorized endorsements."

{¶ 11} There is no reason to believe that the contractual requirements for examining the statement exceed those required by statute. Thus, the phrase "missing signatures" should not be interpreted to include a lack of endorsement.

{¶ 12} Second, a significant number of unendorsed Crescent checks were processed by both KeyBank, and later Fifth Third Bank. This processing indicates that such processing was common and, in itself, no evidence of misappropriation.

■ {¶ 13} Third, it is legally permissible to pay a check to the payee without the payee's endorsement, and thus lack of endorsement is not, in itself, evidence of misappropriation:

"* * * An endorsement in and of itself does not make a check properly payable. Concededly, it is in the best interest of the receiving banks to obtain the payee's endorsement because the effect of no endorsement is to prevent negotiation of the check (*R.C. 1303.23* [*UCC 3–202*]), to deny holder status to subsequent possessors of the check (*R.C. 1303.30* [*UCC 3–301*]), and to prevent obtaining the protected status as holders in due course (*R.C. 1303.34* [*UCC 3–305*]). Furthermore, if a bank negligently fails to obtain an endorsement, it may be liable in negligence for any loss sustained as a proximate cause of the breach of its duty to obtain an endorsement. * * * Where the party intended by the drawer does, in fact, receive the funds, * * * no breach has occurred as between the bank and its customer as the bank has followed the order of its customer by paying the proper and named payee. In other words, payment to the payee or to someone authorized by the payee to receive the proceeds for the payee's benefit, albeit without formal endorsement, satisfies *R.C. 1304.24(A)* as a proper payment of the drawer's funds." (Emphasis added.) *Ohio Bell Tel. Co. v. BancOhio Natl. Bank* (1985), 27 Ohio App.3d 8, 9, 27 OBR 8, 499 N.E.2d 327.

{¶ 14} Fourth, nothing on the back of the unendorsed checks involved in the instant matter indicated that the check funds were deposited in the wrong account:

"3. * * * We saw no irregularities. * * * All checks appeared to be written to legitimate vendors or creditors, and expenditures were generally within the parameters anticipated by Crescent in its annual budgets. * * *

"4. * * * The items on the front of the checks appear to correspond to the information contained in the check register. There is nothing on the back of the checks that indicate to us that the checks were deposited to any account other than the named payees." Affidavit of Thomas J. Ruberg.

{¶ 15} Fifth, *Parent Teacher Assn.*, supra, provided the precedent for the *Borowski* rationale. *Parent Teacher Assn.* holds:

"[T]he code permits parties to a contract of deposit to agree between themselves as to their duties, and the legal consequences to flow from breach, *provided that the agreement does not disclaim the bank's responsibility for its own * * * failure to exercise ordinary care. * * * *"

"The certificate * * * provides the following condition precedent to suit in paragraph 8: 'Unless this association shall notify the Trust Company in writing with 14 calendar days of the delivery * * * of any statement of account and cancelled vouchers, of any claimed errors * * * said Trust Company shall not

be liable for any payments made and charged to the account \* \* \* or for any other error. \* \* \* "

"*Neither provision constitutes an unlawful disclaimer* of the bank's liability." (Emphasis added.) *Parent Teacher Assn. v. Manufacturers Hanover Trust Co.* (1988), 138 Misc.2d 289, 292, 524 N.Y.S.2d 336.

 {¶ 16} The deposit account agreement in the instant matter, quoted from above, contains the following statement:

"This means, for example, that you cannot bring a lawsuit against us, *even if we are at fault,* for paying checks bearing a forgery of your signature unless you reported the forgery within sixty (60) days. \* \* \* " (Emphasis added.)

{¶ 17} The language "even if we are at fault," in effect, disclaims the bank's responsibility for its own failure to exercise ordinary care. Such a disclaimer would invalidate the shortened, contractual period of limitations, according to *Parent Teacher Assn.*

{¶ 18} In short, there was no contractual or statutory duty upon plaintiff to search for lack of endorsement on checks, and no inference that the check funds were placed in the wrong account could reasonably be inferred from lack of endorsement. The contractual limitation period, excusing KeyBank for its own negligence, is invalid.

{¶ 19} A second theory of defense arises out of the "imposter rule". The imposter rule is described as follows:

"If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor ... by impersonating the payee of the instrument ... an indorsement of the instrument by any person in the name of the payee is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument. \* \* \* " R.C. 1303.44(A)— analogous in part to former R.C. 1303.41.

"The padded-payroll or fictitious-payee defense, also known as the imposter rule, validates a forged payee's indorsement whenever the drawer or his employee has designated as payee someone who is not really intended to have an interest in the instrument. In such a case, good title passes to a subsequent transferee and the instrument will be properly payable out of the drawer/employer's bank account, despite a forged payee indorsement. *Ed Stinn Chevrolet, supra,* 28 Ohio St.3d at 227–228, 28 OBR at 310–311, 503 N.E.2d at 530– 532; *Hinkle v. Cornwell Quality Tool Co.* (1987), 40 Ohio App.3d 162, 169, 532 N.E.2d 772, 779.

"The theory behind *R.C. 1303.41(A)* is that the risk of loss caused by a dishonest employee should be placed on the employer rather than the subsequent holder bank because the employer is normally in a better position to

prevent such forgeries by reasonable care in the selection or supervision of employees, or, if not, is at least in a better position to cover the loss by fidelity insurance. *Ed Stinn Chevrolet, supra,* 28 Ohio St.3d at 228, 28 OBR at 311, 503 N.E.2d at 531–532; White & Summers [Uniform Commercial Code (1980)], *supra,* at 794, Section 16–4. Furthermore, under *R.C. 1303.41(A),* the negligence of a bank in accepting an instrument with a forged payee indorsement is immaterial, as the statute is silent on the issue of the bank's lack of care. *Hinkle, supra,* 40 Ohio App.3d at 172, 532 N.E.2d at 781–782; White & Summers, *supra,* at 801–802, Section 16–4." *Golden Years Nursing Home (No. 2), Inc. v. Gabbard* (1994), 94 Ohio App.3d 430, 435, 640 N.E.2d 1186.

{¶ 20} In the court's opinion, the impostor rule is not relevant to the instant matter. The impostor rule is based on the concept that the employer is normally in a better position than a bank to prevent forgeries by exercising reasonable care in the selection and supervision of employees. In other words, it is more convenient and practicable for an employer to stop forgeries by careful hiring and supervision than it is for a bank to detect forgery. This reasoning does not apply, however, to the situation where there is no forgery but only a deposit into the wrong account. It is certainly a simpler and more logical requirement for a bank to read the name of the payee and deposit funds accordingly than for an employer to intuit somehow that the bank is neither reading the name of the payee nor depositing the funds into the account of the payee. That is arguably why the imposter statute refers to an endorsement and not to a lack of endorsement. Additionally, the rationale behind the impostor rule as explained in *Golden Years Nursing Home,* supra, involves a situation where the designated payee is not the person really intended to have an interest in the instrument. In the instant matter, the designated payees were, in every case, exactly the persons who were intended to receive the funds. They simply were not given the funds.

{¶ 21} The basic problem here is that KeyBank, and perhaps other banks as well, simply do not read the names of the payees of checks deposited in an ATM machine. Such a procedure would be intolerable if practiced by tellers at the counter. The failure by banks to read the names of the payees of checks is a calculated risk, accepted for purposes of expediency.

{¶ 22} The evidence presented in this motion indicates carelessness on both sides. The plaintiff, among other things, was careless in not properly checking the background of prospective employees and in giving the same employees check-writing authority as well as the receipt, review, and reconciliation of all checks, bank statements, and accounts. The defendant, as a calculated risk, engaged in conduct that eliminated basic precautions. The court may not weigh the relative degree of negligence of each party:

" * * * If an issue is raised on summary judgment, which manifestly turns on the credibility of a witness because his testimony must be believed in order to resolve the issue, and the surrounding circumstances place the credibility of the witness in question, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness." *Killilea v. Sears, Roebuck & Co.*(1985), 27 Ohio App.3d 163, 27 OBR 196, 499 N.E.2d 1291, headnote two.

"It is not the province of the trial court in ruling on a motion for summary judgment to weigh evidence, assess its probative value, decide factual issues, or choose among reasonable inferences." *Monitor–Rentenbach v. Bethlehem Steel Corp.* (June 20, 1990), Hamilton App. Nos. C–890354 and C–890373, 1990 WL 83983, at 3.

"When a trial court uses summary judgment to terminate litigation, it cannot assess the credibility of the witnesses or the weight of the evidence in determining if there is an actual need for a trial. See *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 218, 520 N.E.2d 198, 202; *Dunville v. Physician–Care, Inc.* (Aug. 23, 1989), Hamilton App. No. C–880342, unreported, 1989 WL 97445." *Smith v. Cincinnati Gas & Elec. Co.* (1991), 75 Ohio App.3d 567, 571, 600 N.E.2d 325.

"It is improper to render summary judgment if the court would be required to pass upon the credibility of witnesses or to weigh their testimony before reaching its conclusion. *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 27 OBR 196, 499 N.E.2d 1291. '[T]he purpose of summary judgment is not to try the issues of fact, but rather to determine whether triable issues of fact exist.' * * * *Viock v. Stowe[–]Woodward Co.* (1983), 13 Ohio App.3d 7, 15, 13 OBR 8, 16, 467 N.E.2d 1378, 1386. It is generally inappropriate to consider either 'the quantum' or the 'superior credibility' of evidence in considering summary judgment. *Hirschberg v. Albright* (Ohio App.1974), 67 O.O.2d 219, 322 N.E.2d 682, 683." *Halley v. Grant Trucking, Inc.* (1990), 67 Ohio App.3d 357, 364, 587 N.E.2d 305.

{¶ 23} For all of the foregoing reasons, the court finds that the motion for summary judgment is not well taken.

{¶ 24} This matter is set for a scheduling conference on April 17, 2003, 8:45 a.m., at or before which time counsel shall present an entry, properly endorsed, denying summary judgment. The court will, in the meantime, have this decision journalized.

*Judgment accordingly.*