J-A22035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LEVY BALDANTE FINNEY & RUBENSTEIN, P.C., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| WELLS FARGO BANK, N.A. AND TD BANK, N.A., | |
| Appellees | No. 3241 EDA 2016 |

Appeal from the Order Entered September 14, 2016
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 001575 June Term 2015

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.*

MEMORANDUM BY PLATT, J.:                    **FILED FEBRUARY 14, 2018**

Appellant, Levy Baldante Finney & Rubenstein, P.C., appeals from the order of September 14, 2016, which granted the motion of Appellees, Wells Fargo Bank, N.A. and TD Bank, N.A., for summary judgment in this action. For the reasons discussed below, we affirm.

We take the underlying facts and procedural history in this matter from the trial court's October 28, 2016 opinion and our independent review of the certified record.

> [Appellant] is a law firm with offices in Philadelphia, Pennsylvania and Haddonfield, New Jersey.  [Appellees], TD Bank ("TD") and Wells Fargo Bank ("WFB"), are national banks that do business in Pennsylvania and New Jersey.

_____

* Retired Senior Judge assigned to the Superior Court.

In its amended complaint, [Appellant] alleged one claim against TD under Uniform Commercial Code ("UCC") § 4-401, 13 Pa.C.S.A. § 4401, Pennsylvania Commercial Code § 4401, and N.J.S.A. 12[A]:4-401[a] when it debited [Appellant's] bank account for checks that were fraudulently indorsed.[b]

> [a] The Pennsylvania and New Jersey statutes listed in [Appellant's] complaint are almost wholesale adoptions of the UCC. Therefore, for purposes of ease and clarity, [the trial] court will refer to the UCC in this opinion unless the applicable and Pennsylvania or New Jersey statute varies from the UCC.
>
> [b] [Appellant's a]mended [c]omplaint, filed November 2, 2015, lists WFB as a defendant in the caption, but does not allege a cause of action against WFB. Instead, the only count in the complaint is alleged against TD. Therefore, WFB's motion for summary judgment is granted, and the balance of this opinion will address why TD is also entitled to summary judgment.

*   *   *

From June 2012 to January 2015, Jack Cohen, then a named partner at [Appellant], stole over $300,000 from [Appellant's] TD checking accounts[c] by fraudulently indorsing[d] twenty-nine checks[e] that had been made payable to referral attorneys, expert witnesses, clients, and other third parties.

> [c] [Appellant] had three bank accounts at TD relevant to this litigation—a Pennsylvania IOLTA [(Interest on Lawyer Trust Account)] account, a New Jersey IOLTA account, and a business premier checking account.
>
> [d] The word "indorsement" used in different tenses throughout [the trial court] opinion, has the same meaning as the word "endorsement." Although the latter spelling is more commonly used, UCC § 3-405 uses "indorsement" to describe signing the back of a check. As such, for purposes of clarity and consistency, "indorsement" will be the version used throughout [the trial court] opinion.

- 2 -

[e] Twenty[-]three of the checks were credited from [Appellant's] PA IOLTA account, five were credited from its NJ IOLTA account, and the last fraudulently indorsed check was credited from [Appellant's] business premier checking account.

Susan Huffington, [Appellant's] bookkeeper, first discovered one of Mr. Cohen's fraudulently indorsed checks in [the fall of][1] 2014. At that time, Ms. Huffington was notified by a referral attorney that he had not received his referral check from the firm. When Ms. Huffington looked into the matter she noticed the check had been cashed, but "the [i]ndorsement looked like [Jack Cohen's] signature."

Following this discovery, . . . Ms. Huffington took no action, other than confronting Mr. Cohen. Even after two of Mr. Cohen's "reimbursement" checks to the firm bounced, Ms. Huffington took no action. It was not until the middle of January 2015 and the discovery of more fraudulently indorsed checks that Ms. Huffington mentioned the issue to [a partner of Appellant].

Additional fraudulently [i]ndorsed checks were discovered when Ms. Huffington reviewed the monthly account statements TD provided. Ms. Huffington would review the statements and look, "for signatures that appear[ed] to be [Mr. Cohen's]." For the New Jersey IOLTA account, Ms. Huffington was able to review the hard-copy account statement, as it contained images of the front and back of each check. However, the Pennsylvania IOLTA account required review of [Appellant's] online account because the hard copy statements did not contain images of the back of checks that were cashed.

After compiling a list of fraudulently indorsed checks, Appellant filed an affidavit of forgery with TD on March 18, 2015,

---

[1] The trial court states Ms. Huffington first discovered the check in early November 2014. (*See* Trial Court Opinion, 10/28/16, at 2). In its brief, Appellant states Ms. Huffington first discovered the checks "in or around October 2014." (Appellant's Brief, at 3). In his deposition, Attorney Mark Rubenstein discusses the problem with the check occurring in September 2014. (*See* Appellees' Motion for Summary Judgment, 7/18/16, Exhibit B, Deposition of Mark Rubenstein, Esq., 6/07/16, at 57).

affirming that it learned of the unauthorized withdrawals on January 22, 2015.

When TD refused [Appellant's] demand for a refund to its accounts, [Appellant] filed a complaint on [September 1], 2015. [Appellant] amended its complaint on November 2, 2015, and TD replied with a proper new matter, pursuant to [Pennsylvania Rule of Civil Procedure] 1030, asserting that the suit was barred, in part, by waiver and estoppel. TD filed [its] motion for summary judgment on July 18, 2016. In its motion, TD argues that [Appellant] waived its right to sue when it failed to notify TD of Mr. Cohen's fraud within thirty days of being provided a monthly account statement, as is required by the [d]eposit [a]greement[f] that governs [Appellant's] business relationship with TD.[g]

> [f] The [d]eposit [a]greement provides [in relevant part],
>
> []*On accounts with check-writing privileges*, you must review your statement and imaged copies of paid checks, if any, we send you and report forgeries, alternations, missing signatures, amounts differing from your records, or other information that might lead you to conclude the check was forged or that, when we paid the check, the proper amount was not paid to the proper person. . . [.] In addition, *you agree not to assert a claim against us concerning any error, forgery or other problem* relating to a matter shown on an [a]ccount statement unless you notified us of the error, forgery or other problem *within thirty (30) [c]alendar [d]ays after we mailed you the statement.*[]
>
>> [Appellees' Motion for Summary Judgment, Exhibit H], Deposit Agreement, at 12-13. (Emphasis Added). [Appellant's] account with TD had check writing privileges. Thus, it was required to review its account statement and report any problems to TD within thirty days.
>
> [g] When [Appellant] opened its checking accounts with TD, it signed a "New Business Agreement" form.

- 4 -

In the second line under the heading "IMPORTANT INFORMATION," the agreement states,

> []The undersigned acknowledge(s) receipt of the Deposit Account Agreement and Fee Schedule will govern my/our account with the Bank. My/Our use of this account shall evidence my/our acceptance of the terms and conditions as set forth in the Deposit Account Agreement . . ."

> [Appellees' Motion for Summary Judgment, Exhibits C, D, and E, New Business Accounts Forms, at 1].

(Trial Court Opinion 10/28/16, at 1-4) (some record citations and footnote omitted).

On September 14, 2016, the trial court granted Appellees' motion for summary judgment. The instant, timely appeal followed. The trial court did not order Appellant to file a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). On October 28, 2016, the trial court issued an opinion. *See* Pa.R.A.P. 1925(a).

On appeal, Appellant raises the following questions for our review:

1. Where the Uniform Commercial Code, as adopted by Pennsylvania and New Jersey, provides that there are "no duties on the drawer to look for unauthorized [i]ndorsements", and all evidence confirms that it is impracticable to require a drawer to review checks and identify unauthorized [i]ndorsements, did the [t]rial [c]ourt err by nonetheless imposing on Appellant, as a drawer, a duty to review the issued checks for unauthorized [i]ndorsements?

2. Given that Sections 4-401 and 3-419 of the Uniform Commercial Code impose strict liability on a drawee bank to reimburse its customer when it wrongfully pays a check by virtue of the check's containing an unauthorized [i]endorsement, was it

error for the [t]rial [c]ourt to absolve the drawee bank of its obligation to make the reimbursement to its drawer?

3. Is a Deposit Agreement between a bank and its customer that effectively eliminates the bank's duties of good faith and ordinary care as required by the Uniform Commercial Code enforceable?

4. Does the fact that a checking account is a law firm IOLTA account alter the relative rights and responsibilities that otherwise exist under the Uniform Commercial Code between a bank and its customer?

5. Where the Uniform Commercial Code allows a drawer three years t[o] file a claim from the time it receives a bank statement indicating that a check or checks were not properly payable because of an unauthorized [i]ndorsement, and where the Uniform Commercial Code does not require a depositor/drawer to look for unauthorized [i]ndorsements, is it reasonable for the bank to reduce the time to thirty days from the time it received a bank statement, within which the drawer must notify the bank?

(Appellant's Brief, at 2).[2]

Appellant appeals from the trial court's grant of summary judgment. We briefly note our standard of review.

> Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is

_____

[2] Despite raising five questions with no subparts in its statement of the questions involved, Appellant divides its argument into three sections with subparts, contrary to our rules of appellate procedure. (**See** Appellant's Brief, at 8–23); **see also** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]"). Nonetheless, we will address its issues because this discrepancy does not hamper our review. **See Donahue v. Fed. Express Corp.**, 753 A.2d 238, 241 n.3 (Pa. Super. 2000).

entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the fact-finder. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate court may disturb the trial court's order only upon an error of law or an abuse of discretion.

***Dibish v. Ameriprise Fin., Inc.***, 134 A.3d 1079, 1084-85 (Pa. Super. 2016), *appeal denied*, 141 A.3d 481 (Pa. 2016) (citation omitted).

As noted, ***supra*** at n.2, Appellant's argument section does not match its statement of the questions involved. Our review of the argument section shows that Appellant's three issues with multiple subparts are, in actuality, minor variations on four main themes. These are: (1) the trial court wrongly imposed a duty upon Appellant to review checks for unauthorized indorsements (***see*** Appellant's Brief, at 9-11, 20-21); (2) the thirty-day period contained in the deposit agreement is unreasonable (***see id.*** at 15-17, 21-22); (3) the trial court erred in finding that Appellant could have reasonably detected the fraud with a more diligent review of its monthly statements (***see id.*** at 11-12, 20-23); and (4) by granting summary judgment to TD, the trial court has allowed the negligence of WFB to go unpunished (***see id.*** at 13-19). We will address these four issues, *seriatim*.

In its first issue, Appellant claims that the "trial court erred in imposing upon Appellant, as a drawer of the check, a duty to review checks for unauthorized [i]ndorsements." (*Id.* at 9; *see id.* at 9-11, 20-21). Specifically, Appellant argues that the UCC does not impose an obligation on customers to look for unauthorized indorsements. (*See id.* at 9). Further, it claims that the trial court erred in imposing a heightened duty upon it because it is a law firm. (*See id.* at 20-21). We disagree.

Section 4-406(c) of the UCC provides as follows.[3]

> If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

UCC § 4-406(c). Comment 5 to Section 4-406 states, in relevant part, "Section 4-406 imposes no duties on the drawer to look for unauthorized indorsements. Section 4-111 sets out a statute of limitations allowing a customer a three-year period to seek a credit to an account improperly charged by payment of an item bearing an unauthorized indorsement." UCC

---

[3] We will follow the trial court's example and will refer to the UCC in this decision unless the applicable Pennsylvania or New Jersey statute varies from it.

§ 4-406, Com. 5. However, Section 4-103 of the UCC provides, in pertinent part:

> The effect of the provisions of this Article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

UCC § 4-103(a).

In the instant matter, the trial court acknowledged that the UCC did not impose a duty on a customer to search for fraudulent indorsements. (***See*** Trial Ct. Op., at 5). However, it found the parties had modified their duties by agreement, in that the deposit agreement required Appellant to notify the bank within thirty days of any problem with a check it issued; these problems included not paying the proper amount to the correct person, which would necessarily include unauthorized indorsements. (***See id.***; ***see also*** Appellees' Motion for Summary Judgment, Exhibit H, at 12-13). Appellant does not dispute that it signed forms acknowledging receipt and acceptance of the terms and conditions of the deposit agreement. (***See*** Appellant's Brief, at 9-23; ***see also*** Appellees' Motion for Summary Judgment, Exhibits D and E). Appellant also does not point to any relevant caselaw that has found that such

modifications are unenforceable.[4] (**See** Appellant's Brief, at 9-11). Thus, the trial court neither abused its discretion nor committed an error of law in finding that Appellant agreed to the modifications contained in the deposit agreement, and that these modifications imposed a duty on it to look for unauthorized indorsements.

Appellant further claims that the trial court wrongly imposed a heightened duty upon it because it was a law firm and the majority of fraudulently indorsed checks were from IOLTA accounts. (**See id.** at 20-21). Again, we note that Appellant mischaracterizes the trial court's opinion. In its opinion, the trial court correctly notes that both the Pennsylvania Rules of Professional Conduct and the New Jersey State Legislature have imposed heightened requirements designed to ensure that a law firm manages the IOLTA accounts properly. (**See** Trial Ct. Op., at 6-7). The trial court does not attempt to graft these requirements onto the UCC but rather points to them

---

[4] We find Appellant's reliance on **Crescent Women's Med. Grp., Inc. v. KeyCorp**, 127 Ohio Misc.2d 93 (C.P. 2003), misplaced. Firstly, **Crescent** is not binding authority on this Court. **See Huber v. Etkin**, 58 A.3d 772, 780 n.8 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2012). Secondly, **Crescent** is factually distinct, in that it did not involve fraudulent indorsements, but rather the wrongful depositing of unindorsed checks marked "for deposit only" in employees' personal accounts. **Crescent**, **supra** at 94. Lastly, the trial court in **Crescent** provided no explanation or legal support for its bald conclusions that the requirement to look for "missing signatures" on checks contained in the deposit agreement does not include missing indorsements and that "[t]here is no reason to believe" that the deposit agreement exceeds the requirements of the UCC. **Id.** at 96; **see id.** at 95-96. Thus, we do not find **Crescent** to be binding or persuasive authority.

to explain that, because of these requirements, Appellant received more information from TD than it ordinarily would and that a more comprehensive review of that paperwork by Appellant's bookkeeper would have enabled Appellant to discover the fraudulent activity within the agreed-upon thirty-day period. (***See id.***). Thus, there is no basis for the Appellant's contention that the trial court imposed a "law firm exception" to the UCC. (Appellant's Brief, at 21). Accordingly, we conclude that the trial court neither abused its discretion nor committed an error of law in its discussion regarding IOLTA acounts. ***See Dibish***, ***supra*** at 1085. Appellant's first issue does not merit relief.

Appellant next claims that the thirty-day period contained in the deposit agreement is unreasonable. (***See*** Appellant's Brief, at 15-17, 21-22). Again, we disagree.

As noted above, the UCC allows for modification of its terms by agreement. ***See*** UCC § 4-103(a). Moreover, the deposit agreement modified the UCC's three-year statute of limitations and required Appellant to notify it of any problems within thirty days of receiving its monthly statement. (***See*** Appellees' Motion for Summary Judgment, Exhibit H, at 12-13). Further, risk-shifting agreements such as the deposit agreement in the instant matter are common and enforceable in the absence of evidence that the bank has failed

to exercise ordinary care.[5]  *See United States v. Payment Processing Ctr.,*

*LLC*, 461 F.Supp.2d 319, 330-31 (E.D. Pa. 2006).[6]

The Pennsylvania courts do not appear to have ruled upon the reasonableness of such notification periods.  However, the New Jersey courts have addressed the issue.  In *Estate of Yahatz v. Bank of America, N.A.*, 2015 WL 8456799, (N.J. Super. Ct. App. Div. filed Nov. 10, 2015), the New Jersey Superior Court, Appellate Division, in an unpublished opinion, enforced a sixty-day notification period contained in a deposit agreement.  *See Yahatz*, *supra* at **2-3 ("time limitations for bringing suit may be imposed by statute . . . or by agreement between the banks and its customer. . . . A customer who fails to notify a bank of an unauthorized transaction with the time limitations set forth in a deposit agreement is precluded from challenging a transaction the customer alleges was unauthorized.") (citations omitted).  In *Oguguo v. Wells Fargo Bank*, 2016 WL 3041853 (D.N.J. filed May 27, 2016) (unpublished decision), the District Court found that a thirty-day time limit is "not manifestly unreasonable, reflecting an interest in expeditiously stopping

_____

[5] We note that while Appellant does argue that a bank failed to exercise ordinary care, that bank is WFB, not TD, and for the reasons discussed, *infra*, WFB is not a proper party to this action.  (*See* Appellant's Brief, at 13-19).

[6] "While we recognize that federal court decisions are not binding on this court, we are able to adopt their analysis as it appeals to our reason."  *Kleban v. Nat. Union Fire Ins. Co. of Pittsburgh*, 771 A.2d 39, 43 (Pa. Super. 2001) (citations omitted).

fraudulent acts and minimizing losses from bank fraud." ***Oguguo***, ***supra*** at *5. In their brief, Appellees cite to an additional seventeen cases wherein both state and federal courts have found contractual notification periods as short as fourteen days to be reasonable. (***See*** Appellees' Brief, at 23 n.6).

Appellant does not point to any cases that have held that such notification periods unreasonable in the absence of the bank's failure to exercise ordinary care.[7] (***See*** Appellant's Brief, at 15-17; 21-22). Instead,

_____

[7] We find Appellant's reliance on ***Phillips Home Furnishings, Inc. v. Continental Bank***, 331 A.2d 840 (Pa. Super. 1974) and ***Hy-Grade Oil Co. v. New Jersey Bank***, 350 A.2d 279 (N.J. Super. Ct. Appellant. Div. 1975), *cert. denied*, 361 A.2d 532 (N.J. 1976), misplaced. The decision of this Court in ***Phillips*** is not good law, as the Pennsylvania Supreme Court overturned it. ***See Phillips Home Furnishings, Inc. v. Continental Bank***, 354 A.2d 542, 544 (Pa. 1976). Moreover, ***Hy-Grade*** does not involve a deposit agreement that places time limits on the right to recover for fraudulent transactions or indorsements. Instead, it involves an exculpatory clause that absolved the banks in question of all responsibility for problems with their night depository, which the court ultimately found to be against the public interest. ***See Hy-Grade***, ***supra*** at 280-83. We find little similarity between an exclusionary clause that releases a bank from all legal liability for a night depository box under its sole possession and control, and a risk-shifting clause that imposes a time limitation on the right to recover from a bank. Thus, we find that ***Hy-Grade*** is not persuasive authority.

While the final decision cited by Appellant, ***In re Clear Advantage Title, Inc.***, 438 B.R. 58 (Bankr. D.N.J. 2010), is much closer factually because it concerns fraudulent withdrawals, it is of limited legal assistance. ***See Clear Advantage***, ***supra*** at 61-63. It does not appear that the defendant bank in ***Clear Advantage*** moved for summary judgment on the basis of the time limitation contained in their deposit agreement, rather the trial court discusses it within the context of certain common law claims that are predicated on the plaintiff's proving of a special relationship between itself and the bank. ***See id.*** at 65-66. In *dicta*, the trial court notes that the bank will likely be able to reduce any award against it by showing the plaintiff's negligence in failing to

- 13 -

Appellant argues that the cited cases are not applicable because they do not involve fraudulent indorsements, which they claim are all but impossible to discern from a review of the statement. (**See id.**). However, as discussed below, we disagree with Appellant's contention.

Initially, we note that we agree with the court in **Oguguo** that such time limits are not unreasonable, and there is a clear interest in stopping fraudulent acts, minimizing losses, and encouraging customers to meticulously monitor their bank accounts. **See Oguguo**, **supra** at *5. Moreover, we find persuasive the reasoning of the New York State Supreme Court in **Galasso, Langione, & Botter, LLP, v. Galasso**. 2016 WL 5108641 (N.Y. Sup. Ct. filed Sept. 19, 2016) (unpublished opinion).

The **Galasso** case concerned a multi-year, very complicated fraud perpetrated by an employee of the plaintiff law firm, which involved, in part, fraudulent indorsements of checks from an IOLA (New York State's version of IOLTA) account. **See Galasso**, **supra** at **1-10, *21. When seeking summary judgment, one of the bank defendants argued that the plaintiff did

_____

report the fraud within the specified time frame. **See id.** at 66. Later, in a footnote, the court briefly discusses that it will apply the statutory time limit contained in New Jersey law rather than the time period contained in the deposit agreement. **See id.** at 65 n.4. However, this Court does not find the trial court's bald statement that the time period is unreasonable to be at all persuasive, particularly in light of the underlying facts in **Clear Advantage**, **see id.** 61-63, which demonstrate that with even a cursory review of its bank statements, the plaintiffs should have easily spotted the fraud within the relevant time frame.

not report the forgeries to the bank until "well outside of the [shortened] [fourteen-] day [notification] period required under the parties' agreement." *Id.* at *22 (footnote and internal quotation marks omitted). The court held that, so long as the bank could prove it made the monthly account statements available to plaintiff and exercised ordinary care, the shortened notification period was triggered. *See id.* at *23. Because the bank was able to show that it mailed the statements to the plaintiff, who did not carefully review them, the court found that the plaintiff could not recover for any checks forged outside the shortened notification period. *See id.* at **24-25.

In the instant matter, Appellant has provided no legal support for its contention that the thirty-day period is somehow presumptively unreasonable in cases of fraudulent indorsement. It has also provided no evidence that TD failed to exercise ordinary care. Further, as discussed above, we do not find such a shortened period to be unreasonable. Moreover, as discussed below, the trial court's finding that Appellant did not exercise due diligence in reviewing the statements is supported by the evidence. Therefore, we conclude that trial court neither abused its discretion nor committed an error of law in finding that the shortened notification period was reasonable. *See Dibish*, *supra* at 1085; *Galasso*, *supra* at **23-25; *Yahatz*, *supra* at **2-3; *Oguguo*, *supra* at *5. Appellant's second claim does not merit relief.

In its third contention, Appellant argues that the trial court erred in finding that Appellant could have reasonably detected the fraud with a more

diligent review of its monthly statements. (***See*** Appellant's Brief, at 11-12, 20-23). Specifically, Appellant maintains that, even if it had more fully reviewed its account statements, including looking at the check backs, it could not have recognized that the signature on the back was Mr. Cohen's, not the payees', unless it already knew there was a problem with the check. (***See id.*** at 11-12). It further contends that by placing the burden on it, as the customer, to monitor its statement for fraudulent activity, the trial court relieved the bank from any "duties when its customer is a law firm." (***Id.*** at 20). In sum, it claims that it is impossible for any customer to discern a fraudulent indorsement unless and until it is contacted by the correct payee to alert it to a problem. (***See id.*** at 20-23).

However, Appellant provides no legal support for these statements. It is long-settled that failure to cite any authority supporting the argument constitutes a waiver of the issue on appeal. ***See Jones v. Jones***, 878 A.2d 86, 90 (Pa. Super. 2005). This Court will not act as counsel and will not develop arguments on behalf of an appellant. ***See Bombar v. West Am. Ins. Co.***, 932 A.2d 78, 94 (Pa. Super. 2007). When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we can dismiss the appeal entirely or find certain issues to be waived. ***See*** Pa.R.A.P. 2101. Because Appellant has failed to develop this issue, it waived it. ***See id.***; ***see also Bombar***, ***supra*** at 94; ***Jones***, ***supra*** at 90.

In any event, in its decision, the trial court acknowledged that it is easier to discover problems with the front of a check then fraudulent indorsements on the back. (**See** Trial Ct. Op., at 7). However, it noted that because the vast majority of the fraudulently indorsed checks were drawn on IOLTA accounts, Appellant had the ability either via the paper statements or online to view the images of the checks, including the backs. (**See id.** at 7). The trial court points to the deposition testimony of Appellant's bookkeeper, Susan Huffington, who admitted that she did not ordinarily scrutinize check images at all, unless she could not balance the account. (**See id.**; **see alao** Appellees' Motion for Summary Judgment, Exhibit K, at 23). Further, our review of the record confirms the trial court's finding that with "some diligence," in its review of the monthly statements, Appellant could have discovered the fraudulent indorsements within the thirty-day period. (Trial Ct. Op., at 7; **see also** Appellees' Motion for Summary Judgment, Exhibit K, at 33, 44-45).

Moreover, Appellant's actions, or more correctly lack of action, when the fraud was finally discovered exemplifies its lack of due diligence in this matter. The check that first alerted Ms. Huffington to the fraud was drawn in the fall of 2014. As discussed above, when made aware of the problem, Ms. Huffington did not alert her supervisors about it and did not alert TD. Mr. Cohen subsequently indorsed four more checks before Ms. Huffington alerted her supervisors to the problem in January 2015. Appellant did not alert TD about the fraudulent activity until March 2015. Had Ms. Huffington acted more

diligently and notified her superiors promptly when she first discovered the issue with the September check, and had Appellant notified TD in January 2015, Appellant could have recovered between $7,500.00 and approximately $43,000.00.[8] (**See** Appellees' Brief, at 10) (listing checks).  Thus, it is evident that, even when Appellant became aware of the fraudulent indorsements, it did not act with due diligence in notifying TD.

In the New Jersey case of **Globe Motor Car Co. v. First Fidelity Bank, N.A.**, 641 A.2d 1136 (N.J. Super. Ct. Law. Div. 1993), *affirmed*, 677 A.2d 794 (N.J. Super. Ct. App. Div. 1996), *cert. denied*, 686 A.2d 764 (N.J. 1996), an office manager embezzled over one and one-half million dollars from an automobile dealership.  **See Globe**, **supra** at 1138.  The trial court in its decision granting summary judgment to defendant First Fidelity Bank, described the plaintiff's monitoring of its finances thusly:

> Throughout the period of [the employee's] deception, routine inspections by plaintiff's accountants, defendant Petrics, Meskin & Nassaur, failed to reveal any discrepancy.  The accountants apparently reviewed only [the employee's] falsified bank reconciliation and the top sheet of the bank statement showing the month-end account balance.  The accountants never audited [the employee's] bank reconciliation and, until he was finally caught, no one reviewed any of his forged cancelled checks, nor did anyone verify any of his forged deposit tickets. On site vehicle inspections by First Fidelity and [other defendants] failed to reveal any reason for alarm.  When vehicle counts did not coincide with bank or dealer records, [the employee] gave the inspectors assorted explanations for the discrepancies.  When

---

[8] Also, had Ms. Huffington notified her supervisors when she discovered the issue with the September check, they might have prevented Mr. Cohen from fraudulently indorsing the remaining checks.

questioned about a vehicle's absence, [the employee] often responded that the vehicle was out on lease, already paid to the bank, or sold or traded subject to payment. [The employee's] embezzlement was finally brought to light in May 1990, when defendant First Fidelity informed [plaintiff] that it was out of trust.

*Id.* at 1138. In upholding the trial court's grant summary judgment in the instant matter, we find persuasive the statements of the trial court in *Globe* as to why the employer is in a better position than the bank to detect employee fraud.

> In considering the relationship of the parties and the nature of risks involved, there is no question that depositors such as [plaintiff] are better suited than their lending bank to manage their own affairs, hire and supervise their own employees, keep their own records, hire their own auditors and detect and deal with corporate theft. The bank's monthly reports to its creditor permits the depositor to determine if any deposits are missing or if checks are drawn without authority. A prompt examination of those records should have disclosed to the [plaintiff] that its office manager was a thief. In fact, even if the bank was aware of [the employee's] defalcation, the bank had no duty to disclose matters of which the other party has actual or constructive knowledge or as to which the information or means of acquiring information of the two parties is equal. Banks cannot be expected to be their borrowers' financial guarantors. Here, [plaintiff's] attempt to assign liability to First Fidelity for its failure to police [plaintiff's] faithless employee is like the farmer, who upon appointing the fox to guard the henhouse, finds fault with the rooster for the subsequent slaughter. In both instances, blame is misplaced.
>
> \* \* \*
>
> Ultimately, fault must lie with the employer, the person or persons who presumably carried out the necessary background checks and maintained the most significant day-to-day contact with the dishonest employee. The employer that hires a thief must suffer the consequences of his or her misjudgment. . . .

*Id.* at 1139, 1142 (citation and quotation marks omitted).

Here, similarly, the record supports the trial court's conclusion that Appellant was in a far better position than Appellees to detect Mr. Cohen's fraudulent activities. (*See* Trial Ct. Op., at 7-9). Appellees provided Appellant with the information necessary to detect the fraud and Appellant failed to make diligent use of those tools. Thus, Appellant's third clam, that the trial court erred in finding that it did not act with due diligence is meritless. *See Globe*, *supra* at 1139, 1142.

In its final contention, Appellant argues that by granting summary judgment to TD, the trial court has allowed the negligence of WFB to go unpunished. (*See* Appellant's Brief, at 13-19). We decline to address this contention. As the trial court correctly notes, while Appellant named WFB as a defendant, it did not include any allegations against it in its amended complaint. (*See* Trial Ct. Op., at 1 n.2; Appellant's Amended Complaint, 11/02/15, at 1-3). Moreover, Appellant admits that it cannot file a direct action against WFB under the UCC because it is not in privity with it. (*See* Appellant's Brief, at 13); *see also ADS Assocs. Grp., Inc., v. Oritani Sav. Bank*, 99 A.3d 345, 361 (N.J. 2014) (bank does not owe party duty in absence of contractual relationship; therefore, non-contracting party does not have direct cause of action against bank). Thus, the issue of WFB's alleged negligence is not properly before us and the issue of whether granting summary judgment in favor of TD "absolves" WFB is irrelevant. (Appellant's Brief, at 16). We conclude that the trial court neither committed an error of

law nor abused its discretion in granting summary judgment. **See Dibish**, **supra** at 1085.

Order affirmed.

Judge Lazarus joins the Memorandum.

Judge Bowes files a Concurring Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/18